IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

RAUL MARTINEZ                          §
    REG. ID. 19240-179                §
V.                                     §          C.A. NO. C-08-336
                                       §
M. MARTIN, ET AL.                      §

## MEMORANDUM AND RECOMMENDATION ON MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

This is a Bivens[1] action brought by a former federal prisoner alleging claims of deliberate indifference to his serious medical needs and violation of his due process rights. (D.E. 1). Bureau of Prison employees M. Martin, N. Pasao, L. Davis, J. White, and G. Maldonado (the "BOP defendants"), move to dismiss plaintiff's claims for lack of subject matter jurisdiction, and, in the alternative, for summary judgment on the merits. (D.E. 24). Defendants employed by the University of Texas Medical Branch, M. Powell, Dr. Dominguez, Dr. Womble, and Dr. Walton (the "UTMB defendants"), also move for summary judgment to deny plaintiff's claims on the grounds of qualified immunity. (D.E. 33). Plaintiff has not filed a response to either motion. For the reasons stated herein, it is respectfully recommended that the summary judgment motions be granted.

## I.      Jurisdiction.

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331.

## II.     Background facts and plaintiff's allegations.

On August 15, 2008, while incarcerated at FCC-Beaumont, plaintiff filed this action alleging claims of deliberate indifference to his serious medical needs and violations of his due process rights

---

[1] Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

with the United States District Court for the District of Columbia.  (D.E. 1).  In particular, plaintiff alleged that, between his arrival at FCC-Beaumont in September 2003, through July 10, 2008, he received inadequate treatment and care of his hernia, enlarged prostate, and pain management of those conditions. Id.

On September 17, 2008, plaintiff filed a motion to transfer the case to Corpus Christi.  (D.E. 8).  Plaintiff related that he was no longer in FCC-Beaumont, but had been transferred to a halfway house in Corpus Christi.  Id.  Further, he stated that he was ill and asked that the case be heard in Corpus Christi to accommodate his medical condition.  Id.  On September 24, 2008, the District Court for the District of Columbia transferred the action to this Court.  (D.E. 11).  No defendant has requested a transfer or disputed venue.

A Spears hearing was held on April 27, 2009.  Plaintiff announced he was physically able to proceed with his lawsuit.

On May 7, 2009, the BOP defendants filed their motion to dismiss/motion for summary judgment.[2]  (D.E. 24).  On July 30, 2009, the UTMB defendants filed their motion for summary judgment.  (D.E. 33).

Plaintiff did not file a response to either motion.  He did submit copies of his medical records with no authenticating affidavit.  Because the medical records contained no authenticating affidavit and also contained unredacted personal identifiers, the records were not imaged, and were struck.  Plaintiff was not harmed by the striking of these documents, though, because defendants submitted

---

[2] Because the BOP defendants moved to dismiss pursuant to FED R. CIV. P. 12(b)(1) & (6), and in the alternative for summary judgment, these defendants have never filed an answer.  Their motion to dismiss and for summary judgment  (D.E. 24) is also treated as an answer because it clearly denies all of plaintiff's allegations and asserts the defendants' right to qualified immunity.

complete copies of plaintiff's medical records.  Plaintiff has not requested additional time to conduct discovery.

### III.    Summary judgment evidence.

In support of their motion for summary judgment, the TDCJ defendants offer the unsworn declaration of Dennis Sherrill, a BOP Supervisory Contact Specialist at FCI-Beaumont (BOP Ex. 1).  They also offer the unsworn declaration of Ariel Vidales, a BOP health specialist at FCC-Beaumont.  (BOP Ex. 2).  Attached to Ms. Vidales' declaration  is a copy of plaintiff's relevant medical records.  ("MR").

The UTMB defendants offer: the affidavit of Charles Adams, UTMB's Medical Director of Outpatient Services (UTMB Ex. A); the affidavit of Larry W. Williams, UTMB District Practice Manager (UTMB Ex. B & D.E. 35); and relevant portions of plaintiff's medical records.  (UTMB Ex. C & D.E. 36).

The summary judgment evidence establishes the following:

Plaintiff arrived at FCC-Beaumont on September 3, 2003.  (BOP, Ex. 2, Vidales Dec. at ¶5). On September 11, 2003, he was examined by UTMB medical staff at the prison.  (MR at 2-3). Following the exam, plaintiff was scheduled for further evaluation concerning his Benign Prostatic Hypertrophy (BPH) and Hypertension (HTN).  Id.

On October 31, 2003, plaintiff reported to the infirmary complaining about his HTN and BPH.  (MR at 6).  The doctor prescribed Bactrim for an infection, and an elastic abdominal band. Id.  In addition, the doctor noted that a referral to urology would be mandated if plaintiff remained symptomatic.  Id.

On December 18, 2003, plaintiff reported to the infirmary complaining about frequent nighttime urination and accidents during the day. (MR at 8). He was scheduled to see a doctor. Id.

On December 23, 2003, plaintiff was seen by Dr. Rhodes for evaluation. (MR at 9). Upon examination, Dr. Rhodes noted that plaintiff's prostate was tender. Id. Dr. Rhodes' diagnoses were: prostatitis;[3] BPH; sinusitis; HTN; and chronic back pain. Id. He discontinued plaintiff's current medications and prescribed new medications including Cardura for his hypertension, Decadron,[4] and antibiotics. Id. He also ordered weekly blood pressure checks. Id.

On January 5, 2004, plaintiff was seen by Dr. Rhodes for continuing care of his HTN and BPH. (MR at 14). Dr. Rhodes made an adjustment to plaintiff's HTN medication. Id. In addition, he ordered lab work including a CBC panel. Id.

On February 11, 2004, plaintiff reported to the infirmary complaining that his prostate problem was not resolving. (MR at 15). Upon examination, Dr. Platt noted that plaintiff's prostate was boggy and there was herniation of previous incisions. Id. at 15. Dr. Platt's plan was to continue plaintiff on Bactrim, no lifting over 10 pounds, and Motrin for pain. Id. He also noted that he would refer plaintiff to UTMB for surgery. Id.

On May 2, 2004, Dr. Rhodes noted that plaintiff's anemia was gone; however, he was still scheduled to see a UTMB urologist. (MR at 15). On July 19, 2004, plaintiff was seen at Hospital Galveston by a urologist for his BHP. Id. at 20. He returned the following day. Id.

---

[3] Prostatitis is a disease of the prostate gland that may cause pain in the groin, painful urination, difficulty urinating and related symptoms. http://mayoclinic.com/health/prostatitis/DS00341.

[4] Decadron is the trade name for the generic chemotherapy drug Dexamthasone, and is classified as a glucocorticosteroid. http://www.chemocare.com/bio/decadron.asp.

On August 3, 2004, plaintiff returned to the infirmary complaining about his nighttime urination frequency.  (MR at  22).

On September 27, 2004, Nurse Sonnier noted that plaintiff was having frequent urination with a decreased flow.  (MR at 23).

On October 19, 2004, plaintiff returned to the infirmary for a work force physical.  (MR at 24).  Dr. Farooq noted that plaintiff had been medically unassigned for the last year.  Id.  Dr. Farooq diagnosed plaintiff with polyuria/nocturia, and referred him to urology.  Id.

On December 30, 2004, plaintiff was seen in the infirmary for a refill on his medications. (MR at 32).

On January 7, 2005, plaintiff was seen by defendant Dr. Dominguez for review of his symptoms and medical issues.  (MR at 33).  Upon examination, Dr. Dominguez noted plaintiff's BPH, prostatitis and polycythemia vera.[5]  Id.

On January 18, 2005, plaintiff reported to the infirmary with complaints that he could not empty his bladder.  (MR at 35). He was scheduled to see a doctor, and instructed to drink plenty of fluids.  Id.

On January 25, 2005,  plaintiff was seen by Dr. Dominguez for his complaints of frequent urination and hesitation.  (MR at 35-36).  Dr. Dominguez ordered blood work, a urinalysis, and prescribed an antibiotic.  Id.

On February 1, 2005, plaintiff related that he did not want to go to Hospital Galveston for work-up unless the doctors would address his nocturia.  (MR at 39).  Plaitiff also reported that his

---

[5] A blood disorder in which the bone marrow makes too many red blood cells. http://www.mayoclinic.com/health/polycythemia-vera/DS00919.

symptoms were 80% better since starting on the Cipro and Cardura.  Id.  Plaintiff also was treated for H. pylori.

On March 10, 2005, plaintiff told Mr. Wells, an administrative associate, that he did not want to go to Hospital Galveston for his prostate.  (MR at 42).  Mr. Wells told him he was scheduled to see a provider.  Id.

On  March 21, 2005, plaintiff complained of dyspepsia and reported that Zantac was no longer helping.  (MR at 40).  He also complained of urinating at night and of pressure in his bladder, and he requested that he be prescribed Proscar.  Id.  The nurse practitioner,  Lisa Holland, started plaintiff on Gaviscon, and continued him on his other medications.  Id. at 43.  He was referred to a gastro-intestinal specialist.  Id.  In addition, an x-ray of his abdomen was taken.  Id.

On April 12, 2005, plaintiff was prescribed Ibuprofen, and it was noted that he was scheduled for a telemed appointment.  (MR at 44)..

On April 29, 2005, plaintiff was seen by  a urologist via telemed.  (MR at  46, 48).  A cytoscopy was ordered. Id.

On June 19, 2005, plaintiff returned to the infirmary complaining of a minimal urine stream and continued pressure and pain.  (MR at 46).

On June 24, 2005, plaintiff was seen in the chronic care clinic for his prostate check-up. (MR at 48-51).  The plan was to check on the ordered cystoscopy test.  Id. at 48.

On July 6, 2005, plaintiff returned from Hospital Galveston after the cytoscopy, and he was prescribed Bactrim, Cipro, and Cardura.  (MR at 56).

In January and February, 2006, plaintiff was treated for complaints of constipation and hemorrhoids at FPC-Atlanta.  (MR at 54-57).  In March, 2006, his chronic care was provided while at FCC-Oklahoma City.  Id. at 58.

Plaintiff returned to FCC-Beaumont, and on March 21, 2006, was seen in the chronic care clinic.  (MR at 63).  Dr. Walton noted that he was scheduled for a telemed urology appointment.  Id.

On April 20, 2006, plaintiff complained again of an H. pylori infection. (MR at 69).  The nurse practitioner referred him to a doctor.  Id.

On May 1, 2006, plaintiff reported to the infirmary complaining of abdomen bloating and pain.  (MR at 73).  He also complained of a perianal abscess.  Id.  He was instructed to return when the abscess began draining so  that a culture could be taken.  Id.

On May 8, 2006, plaintiff reported that his perianal area was healing.  (MR at 74).  A urinalysis was ordered, and he was instructed to avoid spicy foods.  Id.

On May 23, 2006, plaintiff was seen in the chronic care clinic complaining of increased urine frequency.  (MR at 77).  No signs of dehydration were noted.  Id.  Plaintiff denied any acute pain or the inability to urinate.  Id.  The medical staff attempted to issue urinary incontinence protection pads, but plaintiff refused.  Id.

On June 5, 2006, plaintiff was seen in the chronic care clinic complaining of recurrent prostatitis and rectal pain.  (MR at 84-85).  Plaintiff related that he had been seen by urology with a diagnosis of BPH.  Dr. Brooks ordered a urine test following a round of antibiotics, and noted that plaintiff would be restarted on Cardura or Flowmax.  Id.  Plaintiff was instructed to return in 3 weeks.  Id.

On June 9, 2006, plaintiff was seen by defendant Dr. Womble for his BPH and urination frequency.  (MR at 86).  Dr. Womble adjusted plaintiff's medications by starting him on Detropan and Bactrim, and continuing the Cardura.  Id.  He ordered a urine culture and scheduled plaintiff for a telemed conference in 2 months.  Id.

On June 16, 2006, plaintiff returned to the infirmary complaining of stomach problems and difficulty with bowel movements.   (MR at 88).  The nurse scheduled him to see a doctor.  Id.

On June 26, 2006, plaintiff saw Dr. Wombler regarding his frequent nocturnal urination. (MR at 91, 95).  It was noted that plaintiff would return to Hospital Galveston Clinic in two months, and that surgical repair would be addressed at that time.  Id.  Dr. Womble prescribed Flowmax.  Id.

On August 18, 2006, plaintiff participated in a urology telemed appointment.  (MR at 103). Defendant Dr. Walton discussed the possibility of surgery to help with nocturia.  Id.  Plaintiff related that he did not want surgery at his age, and would prefer medication.  Id.  Dr. Walton prescribed Proscar for 6 months, with a follow-up appointment in 6 months.  Id..

On September 26, 2006, plaintiff was seen by Dr. Walton and prescribed Cardura.  (MR at 115).

In November and December 2006, plaintiff was seen repeatedly for an ear and throat infection. (MR at 117-126).

On January 4, 2007, plaintiff reported to the infirmary complaining of severe pain in his prostate, and related that he had to urinate 4 to 5 times a night.  (MR at 129).  He was scheduled to see a doctor.  Id. at 128.

On January 19, 2007, plaintiff complained of severe pain in his left side, inability to urinate, and an enlarged prostate.  (MR at 132).  The nurse practitioner prescribed a hernia belt and pass. Id. at 130.

On January 29, 2007, a nurse practitioner prescribed Bactrim for plaintiff's nose and throat infection, and noted that plaintiff was scheduled to see a provider.  (MR at 136).

On February 23, 2007, plaintiff was seen by Urology via telemed.   (MR at 142-43).  The physician continued plaintiff on Proscar, and ordered a follow-up appointment in 6 months.  Id. at 143.

On March 1, 2007, plaintiff submitted a sick call request seeking a medical pass for his hernia.  (MR at 143).   The nurse noted that plaintiff had a small left inguinal hernia without pain, irritation or edema.  Id.  Plaintiff was advised to talk to the doctor at his next follow-up appointment. Id.

On April 2, 2007, plaintiff was seen in the infirmary for a "bite on butt" and seeking refills on his medications.  (MR at 163).  Plaintiff was given an antibiotic and advised to not touch the wound.  Id. at 162.

On May 3, 2007, plaintiff was seen in the infirmary concerned that he had taken the wrong medication and felt weak.  (MR at 169).  The assessment was anxiety, and he was counseled.  Id.

On May 11, 2007, plaintiff met with urology clinic doctors via telemed who cleared him for prostate surgery.  (MR at 170).  His medications were also continued.  Id.

On June 5, 2007, plaintiff reported to the infirmary seeking a work pass due to his hernia pain.  (MR at 171-72).  Plaintiff told the nurse that he had thrown his hernia belt away because it did not work, and that he expected medical to continue his work pass after the last one expired.  Id.  A

dispute arose and plaintiff's behavior was characterized as belligerent and rude.  Id.  He stated that he would follow-up with the provider in two days.  Id.

On June 7, 2007, plaintiff was seen by Dr. Walton for insomnia, nocturia, and left inguinal hernia. (MR at 173-76).  Dr. Walton ordered lab work, an EKG, and referral to general surgery for his hernia.  Id.

On July 8, 2007, plaintiff returned to the infirmary complaining of a bloody stool, but denied any pain. (MR at 177).  He was given a container for a stool specimen.  Id.

On July 10, 2007, plaintiff complained of stomach infection, nausea, bloated, heartburn, and a nose and throat infection.   (MR at 178-79).  The assessment was "health seeking behavior" and he was scheduled to see a provider to evaluate "throat pain for 1 year" and changes in his bowel movement.  Id. at 178.  On July 11, 2007, a physician's assistant gave plaintiff an injection of Promethazine to help with nausea.  Id. at 180-81.

On July 13, 2007, Dr. Wildenfels met with plaintiff via telemed to discuss his transurethra resection of his prostate (TURP surgery).  (MR at 193).  Learning that, in 1980, plaintiff had heart valve replacement surgery, he recommended that an echo test be performed.  Id.

On July 16, 2007, plaintiff went to the infirmary to be medically cleared for surgery.  (MR at 185-188).  Dr. Womble noted that, despite plaintiff's prior heart valve replacement, he had no subsequent cardiology-related problems, and he cleared him for surgery.  Id. at 185.

 Plaintiff underwent an echo at Hospital Galveston on August 13, 2007.  (MR at 196).

On September 14, 2007, plaintiff was seen in the chronic care clinic for assessment of his health and review of his medications.  (MR at 200-203). Plaintiff continued to complain of a sore throat with mucous.  Id. at 204-212.

On October, 4, 2007, plaintiff sent a request to medical to see if his surgery had been approved by Washington.  (MR at 215).  Plaintiff was advised that his surgery did not need to be approved by Washington, and personnel would check on surgery status.  Id.

On October 22, 2007, plaintiff was seen in the infirmary requesting Amoxil and Bactroban stating that these were the only medications that worked for him.  (MR at 220).  It was noted that he had never been prescribed Bactroban, and plaintiff admitted his cellie gave it to him.  Id.

On November 15, 2007, plaintiff reported to the infirmary complaining of "difficult and painful urination, frequent urination and pain in the groin," and reported "I feel I have an infection in my prostate."  (MR at 223).  Plaintiff stated that the pain was constant and getting worse every year.  Id.  Plaintiff was started on antibiotics.  Id.

On November 26, 2007, plaintiff returned to the infirmary complaining that he had to strain in order to urinate.  (MR at 225).  Nurse Lacy wrote: **PLEASE SCHEDULE PT TO SEE PROVIDER TO EVALUATE BPH, URINARY PROBLEMS.**  Id.  In addition, a urinalysis was ordered, as well as a prostate specific antigen.  Id.

On December 7, 2007, plaintiff complained of foul smelling urine.  (MR at 227-228).  The nurse practitioner gave him an injection of Ceftriaxone.  Id.

On December 17, 2007, plaintiff complained of difficult painful urination, frequent urination, low back pain, and pain in the groin.  (MR at 231-33).  He was scheduled to see a provider.  Id.

On January 4, 2008, Dr. Walton approved a catheter with leg bag.  (MR at 233-35).

Nursing notes dated January 7, 2008, reported that plaintiff was feeling better since the catheter.  (MR at 237).  Surgery had been delayed so he could be medically cleared by cardiology.  Id.

On February 4, 2008, plaintiff requested that he be seen by a doctor for an enlarging left inguinal hernia. (MR at 244). On February 8, 2008, medical renewed his medically unassigned pass. Id. at 246. It was noted that plaintff was waiting for his appointment with urology. Id.

On February 19, 2008, plaintiff was seen by cardiology via telemed. (MR at 250). Dr. Huang cleared plaintiff for a prostatic procedure, noting that no further cardiac work-up was necessary. Id. at 249. On February 28, 2008, plaintiff was instructed to stop taking his Motrin prior to the surgery. Id.

On March 4, 2008, Lieutenant Timms called medical to report that plaintiff could not go on the bus to Hospital Galveston for a surgery consult because the warden had not signed his papers, and therefore, the trip would have to be rescheduled. (MR at 258).

On March 21, 2008, plaintiff complained to medical that he was staining his underwear from the catheter and that he needed pain medication. (MR at 266-69).

On March 31, 2008, a surgery consult was conducted. (MR at 270-71). UTMB staff concluded that plaintiff's hernia was small and reducible, such that surgery was not indicated. Id.

On April 2, 2008, plaintiff returned from Hospital Galveston after seeing urology and was referred for the TURP surgery to treat his BPH. (MR at 271-74). The urologist also proscribed an antibiotic and Tylenol #3 for pain. Id. at 273.

On April 3, 2008, plaintiff reported to the UTMB nursing staff with complaints of abdominal pain. (MR at 275-280). Dr. Walton ordered an abdominal x-ray. Id. at 276.

On April 10, 2008, plaintiff reported to the nursing staff for complaints of constipation and back pain, and he was seen by a mid-level provider who prescribed medication. (MR at 281-87). On April 17, 2008, he saw a mid-level provider for complaints that he was leaking urine in the area

of his catheter, and a urinalysis was ordered.  Id. at 290-92.   On May 2, 2008, Dr. Womble diagnosed

plaintiff with chronic urethritis due to his catheter.  (MR at 298).

On May 19, 2008, plaintiff was taken to Hospital Galveston for the TURP surgery. (MR at

300-03).  Plaintiff refused Tylenol #3 because it caused him stomach problems, but he was permitted

to take Tylenol.  Id. at 301, 305.

On May 29, 2008, plaintiff complained that he had not stopped bleeding since the surgery,

that he had severe pain with bowel movements, and that his catheter was touching his hernia.  (MR

at 306-308).  Upon examination, the PA noted that the urine in plaintiff's bag was cloudy, but there

was no blood in his underpants.  Id. at 308.  She advised him to keep his follow-up appointment with

urology.  Id.

On June 4, 2008, plaintiff was seen at Hospital Galveston for his post-status TURP where

he was seen by Dr. Walton.  (MR at 315-16).  Dr. Walton removed plaintiff's catheter and released

him to participate in activities as could be tolerated.  Id. at 316.

On June 6, 2008, Nurse Lacy reported to plaintiff's cell and found him holding his abdomen

and complaining of cramps, and shaking.  (MR at 317-23).  Plaintiff was able to walk to medical,

although he was moaning.  Id. at 321.  Plaintiff's temperature was 101.  Id.  A urine sample was

taken and sent to the local lab.  Id. at 323.  Plaintiff remained in the infirmary, and on June 8, 2008,

Dr. Walton started plaintiff on Amoxicillin and gave him an injection of Lorazepam to help with the

pain/anxiety.  Id. at 324.

On June 17, 2008, plaintiff complained of frequent nocturnal urination and pain that

prevented him from sleeping.  (MR at 333-37).  His recent labs revealed that his infection was

resistant to a number of medications. Id. at 336. The plan was to treat plaintiff with Augmentin and Rocephin. Id.

On June 24, 2008, plaintiff's urine dipstick was positive for blood, white blood cells, and nitrates. (MR at 339-34). Plaintiff was given an antibiotic ointment as well as Ibuprofen.

On June 27, 2008, plaintiff saw Dr. Walton via telemed. (MR at 344-46). Dr. Walton discontinued the Cardura and ordered Ditropan to address plaintiff's over-active bladder. (MR at 344-46).

Throughout July 2008, plaintiff continued to complain of frequent nighttime urination and prostate area pain. (MR at 347-64). Dr. Womble continued plaintiff on Ditrophan, Rantidine for his stomach, Ibuprofen for pain, and fiber tablets and Docusate Sodium for constipation. Id. at 364.

## IV.   Summary judgment standard.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002). The Court may not weigh the evidence, or evaluate the credibility of witnesses. Id. Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible

14

in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); see also Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." Caboni, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." Anderson, 477 U.S. at 250-51.

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense. See Milchalik v. Hermann, 422 F.3d 252, 262 (5th Cir. 2005). When a government official has pled the defense of qualified immunity, the burden is on the plaintiff to establish that the official's conduct violated clearly established law. Id. Plaintiff cannot rest on his pleadings; instead,

he must show a genuine issue of material fact concerning the reasonableness of the official's conduct.  Bazen v. Hidalgo County, 246 F.3d 481, 490 (5th Cir. 2001).

**V.     Discussion.**

   **A.     BOP defendants – Motion to dismiss.**

The BOP defendants first move to dismiss plaintiff's claims against them on the grounds that, to the extent they are sued in their official capacities, those claims are against the United States, and as such, are barred by sovereign immunity.  They argue that, to the extent plaintiff is suing them in their individual capacities, he fails to state a constitutional violation.

   **1.     Official capacity claims.**

"The United States is a sovereign, and, as such, is immune from suit unless it has expressly waived such immunity and consented to be sued."  Hebert v. United States, 438 F.3d 483, 487 (5th Cir. 2006) (internal citations omitted); Truman v. United States, 26 F.3d 592, 594 (5th Cir. 1994) ("As the sovereign, the United States is immune from suit unless, and only to the extent that, it has consented to be sued").  Sovereign immunity is jurisdictional in nature.  See Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 475 (1994).  Such immunity protects the United States from liability, and deprives the court of subject-matter jurisdiction over claims against the United States.  See Hebert, 438 F.3d at 487-88 (citing United States v. Mitchell, 463 U.S. 206, 212 (1983)).  Thus, before a court proceeds on a case against the United States, it "must first decide whether one of the government's several waivers of sovereign immunity applies."  Truman, 26 F.3d at 594.

16

The United States has not waived sovereign immunity for alleged constitutional violations. Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 410 (1971).[6] Thus, plaintiff's constitutional claims against the BOP defendants in their official capacities are barred by sovereign immunity, and the Court lacks jurisdiction over those claims. Thus, it is respectfully recommended that plaintiff's claims against the BOP defendants in their official capacities be dismissed for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

**B.      BOP defendants– Motion for summary judgment.**

**1.      Individual capacity claims.**

Plaintiff has also sued the BOP defendants in their individual capacities. Plaintiff complains that he suffered pain and the deterioration of his medical condition because he was subjected to delays in treatment and inadequate medical care for his prostate and hernia conditions.  (D.E. 1 at 8-9).  Plaintiff is suing FCC-Beaumont Warden Martin for failing to  provide or enforce proper guidelines to his subordinates and for deliberate indifference to his serious medical needs.  Id.  He is suing Ms. Davis and Mr. White for failure to investigate his claims about the unconstitutional medical treatment.  Id.  He is suing BOP Regional Director G. Maldonado for filing a false report to Congressman Ortiz to "cover-up the grossly inadequate medical care plaintiff was receiving from Defendants..."  Id.  He alleges that defendant Paseo falsified his medical records.  Id.

------

[6] The United States has waived immunity for certain negligent or wrongful acts or omissions of its agents who act within the scope of their employment.  Truman, 26 F.3d at 594.  Those claims must be brought pursuant to the Federal Torts Claim Act, 28 U.S.C. § 1346, and are subject to exhaustion.

*(a)* ***Warden Martin.***

In his first cause of action*,* plaintiff bases liability against Warden Martin on the ground that he failed to provide or enforce BOP guidelines to his subordinates about providing medical care to inmates. (D.E. 1 at 8). This claim fails to state a constitutional violation. "[A] prison official's failure to follow the prison's own policies, procedures or regulations does not constitute a violation of due process, if constitutional minima are nevertheless met." Myers v. Klevenhagen, 97 F.3d 91, 94 (5th Cir. 1996); see also Hernandez v. Estelle, 788 F.2d 1154, 1158 (5th Cir. 1986) (mere failure of prison officials to comply with their own regulation is not a constitutional violation). Moreover, plaintiff admits that he was able to complain about the medical care he was receiving via the BOP grievance system by filing numerous cop-outs and grievances. (See D.E. 1 at 9). Thus, plaintiff's claim that Warden Martin violated his due process rights is without merit, and it is respectfully recommended that it be dismissed.

In his second cause of action, plaintiff claims that Warden Martin was deliberately indifferent to his serious medical needs because he allowed subordinates to delay medical treatment or cause them to delay medical treatment. (D.E. 1 at 8). However, as in § 1983 litigation, to hold an individual liable on a Bivens claim, the plaintiff must allege that the individual was personally involved in the constitutional violation or whose acts were causally connected to the constitutional violation alleged. Woods v. Edwards, 51 F.3d 577, 583 (5th Cir. 1995). That is, personal involvement is an essential element of a civil rights action. Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983). Vicarious liability does not apply to constitutional claims. Pierce v. Tex. Dep't of Crim Justice, 37 F.3d 1146, 1150 (5th Cir. 1994). Supervisory officials may be held liable only if: (1) they affirmatively participate in the acts that cause constitutional deprivations; or (2) they

18

implement unconstitutional policies that result in plaintiff's injury.  Mouille v. City of Live Oak, 977 F.2d 924, 929 (5th Cir. 1992).

In this case, plaintiff's original complaint is devoid of any personal involvement by Warden Martin.  Plaintiff does not claim that defendant Martin was involved in any decisions concerning his medical care.  Moreover, defendants offer the unsworn declaration[7] of Dennis Sherill, a BOP contract specialist, whose duties include monitoring the contract between the BOP and UTMB under which UTMB provides medical, psychiatric and dental care to all inmates at FCC-Beaumont.  (BOP Ex. 1, Sherill Dec. at ¶ 2).  Under the terms of the contract, the BOP is obligated to pay UTMB a flat rate per day per inmate.  Id. at ¶ 3.  In exchange, UTMB provides all medical services and "makes all decisions concerning appropriate care for all such inmates."  Id. at ¶ 4.  Thus, Warden Martin had no involvement with plaintiff's medical care.  Accordingly, it is respectfully recommended that Warden Martin be granted summary judgment in his favor, and that plaitiff's claims against him be dismissed.

     *(b)*     ***Defendant Paseo.***

In his third and fourth cause of action, plaintiff claims that defendant Paseo, a BOP Health Services Supervisor, was deliberately indifferent to his serious medical needs because he failed to properly schedule appointments for him outside of the prison.  (D.E. 1 at 8, 9).  Again, however, although defendant Paseo may have been responsible for scheduling visits to Hospital Galveston, he had no personal involvement in deciding ***when*** it was necessary for plaintiff to go to Hospital Galveston.  Defendant Paseo was not responsible for providing health care at FCC-Beaumont. Indeed, under the BOP-UTMB contract, only medical personnel could order tests or procedures that

---

[7] In not filing a response, plaintiff has failed to object to the use of the unsworn declaration.

19

might take place outside of the prison. Plaintiff does not contend that Paseo failed to make appointments when ordered to do so by approved medical personnel.

There is one instance, on March 4, 2008, that plaintiff was scheduled to go to Hospital Galveston for TURP surgery, but, because the warden failed to sign the paperwork, the appointment had to be rescheduled.  (MR at 258).  However, on March 31, 2008, a general surgery consult was conducted, and it was determined that surgery was not indicated because the hernia was small and reducible.  Id. at 270-71.  Plaintiff fails to offer any evidence to demonstrate that Paseo acted with specific intent to deny him care on that date.  Moreover, despite the fact that plaintiff's BPH was a painful and irritating condition, it was not life threatening.  Indeed, plaintiff himself postponed the surgery several times, and his doctors postponed the surgery in order to evaluate his heart condition.

In order to state a constitutional claim for denial of adequate medical treatment, a prisoner must allege the official(s) acted with deliberate indifference to serious medical needs.  Wilson v. Seiter, 501 U.S. 294, 303.(1991); Estelle v. Gamble, 429 U.S. 97, 105 (1976); Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991).  Deliberate indifference encompasses more than mere negligence on the part of prison officials.  Farmer, 511 U.S. at 837.  It requires that prison officials be both aware of specific facts from which the inference could be drawn that a serious medical need exists and then the prison official, perceiving the risk, must deliberately fail to act.  Id.  Furthermore, negligent medical care does not constitute a valid § 1983 claim.  Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993).  See also Graves v. Hampton, 1 F.3d 315, 319 (5th Cir. 1993) ("[i]t is well established that negligent or erroneous medical treatment or judgment does not provide a basis for a § 1983 claim").  As long as prison medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights.  Youngberg v. Romeo, 457 U.S. 307, 322-

20

23 (1982).  Finally, active treatment of a prisoner's serious medical condition does not constitute deliberate indifference, even if treatment is negligently administered.  See Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999); Mendoza, 989 F.2d at 195; Varnado, 920 F.2d at 321.  "Deliberate indifference is an "extremely high standard to meet."  Domino v. Texas Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001).

Here, although plaintiff claims that he was denied medical treatment from 2003 until 2008, the record establishes that he was regularly seen by UTMB medical staff at FCC-Beaumont, including nurses, nurse practitioners, physician's assistants, and doctors, by doctors via telemed, and at Hospital Galveston.  He was prescribed appropriate medications, and attempts to ease his discomfort via a catheter and moderate pain medications.  Plaintiff offers no evidence to establish that Paseo was deliberately indifferent to his serious medical needs.  Thus, it is respectfully recommended that Paseo be granted summary judgment in his favor, and that plaintiff's claims against this defendant be dismissed.

(*c*)     ***Defendants Davis and White.***

In his sixth cause of action, plaintiff argues that BOP defendants Davis and White were deliberately indifferent to his serious medical needs because they failed to investigate properly his complaints about the medical care he was receiving.  (D.E. 1 at 9).  Defendant White is a counselor at FCC-Beaumont whom plaintiff claims was responsible for reviewing and investigating all administrative appeals.  (D.E. 1 at 2).  Defendant Davis was a Unit Manager at FCC-Beaumont.  Id.

Assuming plaintiff's allegations as true, that Davis and White failed to investigate properly his grievances, he fails to state a constitutional violation against these defendants because a prisoner has no constitutionally protected right to have his grievances investigated and/or resolved because

21

resolution of the grievance does not involve a "significant hardship ... in relation to the ordinary incidents of prison life." See Johnson, 54 Fed. Appx. 796, 796 (5th Cir. 2002) (per curiam)(citing Sandin v. Conner, 515 U.S. 472, 485-86 (1995). See also Taylor v. Cockrell, 92 Fed. Appx. 77, 78 (5th Cir. 2004) (same). Thus, summary judgment in favor of defendants Davis and White is appropriate.

   *(d)*  ***Defendant Maldonado.***

   Plaintiff has sued BOP defendant Maldonado in his seventh cause of action, alleging that, on March 4, 2008, he filed a false report to Congressman Ortiz to "cover-up" the inadequate medical care plaintiff was receiving.  (D.E. 1 at 9).  Defendant Maldonado is a South Central Regional Director for the BOP.  (D.E. 1 at 2).

   Although plaintiff makes reference to a report and cover-up, he offers no evidence to support these allegations. Plaintiff's bald, conclusory allegations that Maldonado filed a false report are insufficient to defeat summary judgment.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  Moreover, even if Maldonado filed a false report with Senator Ortiz on March 4, 2008, plaintiff underwent TURP surgery on May 19, 2008.  (MR at 300-02).  Plaintiff fails to establish how the filing of a false report delayed or denied him medical care.  Thus, Maldonado is entitled to summary judgment in his favor.

   **C.**  **UTMB defendants–Motion for summary judgment.**

   Plaintiff has sued Dr. Dominguez, Dr. Womble, and Dr. Walton for deliberate indifference to his serious medical needs.  (D.E. 1 at 9).  He has also sued Monroe Powell, the medical administrator for UTMB at FCC-Beaumont, whom plaintiff claims was deliberately indifferent to his serious medical needs (3rd cause of action), and who "failed to enforce the law," (4th cause of

action).  (See D.E. 1 at 8-9).  Defendants move for summary judgment on grounds of qualified immunity.  (D.E. 33).

**1.      Qualified immunity.**

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Immunity in this sense means immunity from suit, not merely from liability. Jackson v. City of Beaumont, 958 F.2d 616, 620 (5th Cir. 1992).  "Qualified immunity is designed to shield from civil liability all but the plainly incompetent  or those who violate the law."  Brady v. Fort Bend County, 58 F.3d 173, 174 (5th Cir. 1995).  In general, "qualified immunity represents the norm."  Id.

There are two steps in the qualified immunity analysis.  Hampton Co. Nat. Sur. , LLC v. Tunica County, Miss., 543 F.3d 221, 225 (5th Cir. 2008).  First, viewing the evidence in the light most favorable to plaintiff, the Court determines whether the defendant violated the plaintiff's constitutional rights.  Id.  "Whether there is evidence to support the conclusion that a constitutional right was violated is a legal question."  Id.

At the second step, the Court considers whether the defendant's actions were objectively reasonable in light of clearly established law at the time of the conduct in question.  Id.  Applying this standard, the Court must determine whether reasonably competent officers would have known that their actions violated law which was clearly established at the time of the disputed action.  Id. The court applies "current law to the first step and the law at the time of the incident to the second step[.]"  Flores v. City of Palacios, 381 F.3d 391, 395 n. 3 (5th Cir. 2004).

While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory.  Pearson v. Callahan, 555 U.S. ___, 129 S. Ct. 808 (January 21, 2009) (receding from Saucier v. Katz, 533 U.S. 194 (2001)).

**2.    Analysis.**

*(a)    Constitutional violation.*

As stated earlier, to state a claim of deliberate indifference to serious medical needs, a plaintiff must establish  that prison officials: (1) were aware of specific facts from which the inference could be drawn that a serious medical need exists, and (2) perceiving the risk, the prison officials deliberately fail to act.   Farmer, 511 U.S. at 837.

*(i)    Defendant doctors.*

Plaintiff charges that Dr. Dominguez, Dr. Womble, and Dr. Walton needlessly allowed him to suffer intense pain for over 4 years.  (D.E. 1 at 9).  However, the uncontested summary judgment evidence refutes this claim.

Plaintiff was diagnosed with BPH and HTN in September 2003. (MR at 2-3).  At that time, medications were prescribed and plaintiff was counseled.  Id. He was seen in the infirmary three more times that year, with his medications adjusted.  Id. at 8,9.

In 2004, plaintiff was seen in the infirmary no less than nine times for his BPH and prostatitis.  (MR at 14, 15, 20, 22, 23, 24-27, 30-32, 33).

It was not until January 2005 that plaintiff was first seen by defendant Dr. Dominguez. (MR at 35-36).  At that time, he treated plaintiff for an infection and ordered additional tests. Id.  In

February 2005, plaintiff related that he was 80% better since starting on the Cipro and Cardura medications.  Id. at 39.  Indeed, on March 10, 2005, plaintiff told Mr. Wells that he did not want to go to Hospital Galveston.  Id. at 42.  There is no indication in the record that plaintiff saw Dr. Dominguez after February 2005, nor does plaintiff claim to have seen him thereafter.  (See D.E. 1).  Thus, as to Dr. Dominguez, the uncontested summary evidence establishes that he saw plaintiff, correctly diagnosed his conditions, and prescribed the appropriate medications, resulting in an 80% improvement.

Approximately a year later, on March 21, 2006, plaintiff was seen by Dr. Walton for the first time.  (MR at 61, 64).  Plaintiff complained of "a problem with urination."  Id. at 64.  Dr. Walton continued plaintiff on his medications and ordered a consult with urology.  Id. at 61, 63.  For the next few months, plaintiff sent cop-outs complaining of gastroesophageal reflux, stomach bloating, stomach pain, rectal pain, and a foot deformity.  Id. at 68-74.  He was diagnosed with a hernia, and counseled to avoid spicy foods.  Id.

On June 9, 2006, plaintiff was seen via telemed by Dr. Womble for the first time.  (MR at 84-86).  Dr. Womble's impression was BPH and urinary frequency.  Id.  Dr. Womble's plan was to start plaintiff on Detropan and Bactrim, continue the Cardura, and order several tests.  Id.  That is, as of June 2006, no defendant had ordered the TURP surgery, and then delayed such surgery.  To the extent plaintiff believes they should have ordered prostate surgery sooner, that is nothing more than a disagreement with the course of treatment, and is not actionable.

On June 26, 2006, plaintiff saw Dr. Womble again for a follow-up appointment.  Id. at 91, 95.  His plan was to start Flowmax, and he indicated that surgical repair would be discussed in two months.  Id.

25

Plaintiff was not seen by Dr. Womble again until July 16, 2007.  (MR at 185-188).  Dr. Womble cleared plaintiff for surgery despite his 1980 heart valve replacement.  Id.  However, Dr. Womble's decision must have been overridden, because a consult with cardiology was made, and surgery was deferred until after he was cleared by cardiology.  Id. at 237.  However, there is no evidence to suggest that Dr. Womble delayed the surgery.    On August 18, 2006, plaintiff consulted with Dr. Walton via telemed.  Id. at 103.  The nursing notes specifically state: "**Pt does not want surgery**."  Id.  Plaintiff was ordered to consult with urology again in six months.  Id.  On September 26, 2006, Dr. Walton ordered that plaintiff restart on Cardura.  Id. at 115.  Dr. Walton continued to meet with plaintiff via telemed, and on May 11, 2007, he was the physician that recommended plaintiff for surgery.  However, he also learned of plaintiff's heart valve replacement, and ordered an ECHO as well as a cardiology approval before surgery.  Although plaintiff objects to this "delay," the postponement of the surgery was to ensure that plaintiff's heart condition could withstand the surgery.  Thus, although plaintiff characterizes the time for cardiology to evaluate him as delay, it, too, is merely a disagreement with the course of treatment, and is not actionable.  Plaintiff fails to state a claim against Dr. Walton.

Moreover, in support of their motion for summary judgment, defendants offer the affidavit of Dr. Charles D. Adams, the Medical Director of Outpatient Services for UTMB.  (UTMP Ex. A, Adams' Aff't at ¶ 3).  Dr. Adams reviewed and summarized plaintiff's medical records,  and offers the following opinion as to the care provided by the defendant doctors:

> In Summary, based upon my education, training, and experience as a physician both in the community and correctional settings, it appears that Mr. Martinez had a chronic condition (BPH) which the physicians at [FCC-Beaumont and Hospital Galveston] attempted to manage medically, rather than surgically at the patients

own request.  Various medications were attempted, and when those did not work to his satisfaction, others were substituted....

> When it became clear that Mr. Martinez' prostate condition could not be managed medically, he was scheduled for surgery.  The surgery had to be rescheduled due to an apparent infection, and the failure regarding security personnel to complete the necessary paperwork was beyond the control of the defendant physicians.  I believe that it was prudent of Urology to request cardiac clearance before the surgery, as it was for them to wait until the infection had resolved as well.

> With respect to the hernia repair, as it was reducible at all times, it too, was considered an elective procedure which could wait until the prostate issues had been addressed.....

(Adams' Aff't at ¶¶ 31-33).

Plaintiff offers no evidence to create a genuine issue of material fact, and the summary judgment evidence demonstrates that none of the defendant doctors were deliberately indifferent to plaintiff's serious medical needs.

### (ii)    *Defendant Powell.*

As to defendant Powell, plaintiff claims that he was deliberately indifferent to his serious medical needs and failed to enforce BOP policies that protect an inmate from suffering.  (D.E. 1 at 8, 9).  Plaintiff alleged that Powell was responsible for delays in receiving medical treatment.  In support of their summary judgment motion, the UTMB defendants offer the affidavit of Larry W. Williams, a District Practice Manager for UTMB who has reviewed plaintiff's grievances and claims against Mr. Powell, an Administrative Associate (UTMB Ex. B, Williams Aff't at ¶ 3).  Mr. Williams  testifies:

> ... It is not the role of the Administrative Associate to enforce policies or make clinical decisions.  As an Administrative Associate, Mr. Powell had no responsibility in the actual provision of medical services; his role is to ensure that patients such as

Mr. Martinez have appropriate access to the services rendered by those medically trained.

*****

Mr Powell's job responsibilities did not include reviewing, approving, forwarding or scheduling referrals.  Mr. Powell was not responsible nor was he involved in scheduling Mr. Martinez' medical appointments outside the prison.

... Mr. Powell provided appropriate responses to Mr. Martinez' request for care.  As a result of my review, I conclude that the actions taken by Mr. Powell are consistent with other reasonably well-trained Administrative Associate's knowing what Mr. Powell knew at the time and under the same or similar circumstances.

(Williams Aff't at ¶¶ 3, 5, 6).  The uncontested summary judgment establishes that Mr. Powell did not have authority to delay or schedule medical appointments outside of the prison, and that he was not deliberately indifferent to a serious medical need of plaintiff.

### 2.      Objective reasonableness.

Because plaintiff has failed to state a constitutional violation, the Court need not examine whether the defendants' actions were reasonable.  See Saucier, 533 U.S. at 201 (if the facts alleged do not establish that the officer's conduct violated a constitutional right, then the qualified immunity analysis need proceed no further and qualified immunity is appropriate).

## VI.    Recommendation.

Plaintiff fails to establish that there exists a genuine issue of material fact regarding his claims of deliberate indifference, and the BOP defendants and UTMB defendants have established that they are entitled to summary judgment as a matter of law.  Accordingly, it is respectfully recommended that the BOP defendants motion to dismiss/summary judgment (D.E. 24) be granted

and that the UTMB defendants' motion for summary judgment (D.E. 33) be granted, and that plaintiff's claims be dismissed with prejudice.

Respectfully submitted this 18th day of September, 2009.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(C); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error*, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).